

Date signed June 01, 2005

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| **In re:** | * | |
| **Marguerite Patricia Thomas,** | * | |
| | * | |
| | * | |
| **Debtor.** | * | GERALD H. SCHIFF |
| ************************************ | * | U. S. BANKRUPTCY JUDGE SITTING BY DESIGNATION |
| **Marguerite Thomas,** | * | Adv. Proc. No.   04-2034 |
| | * | |
| | * | |
| **Plaintiff,** | * | |
| vs. | * | |
| | * | |
| **RCB Group, LLC,** | * | |
| | * | |
| **Defendant.** | * | |

### MEMORANDUM OF DECISION

Marguerite Patricia Thomas ("Debtor") filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code[1] on July 13, 2004, and on that day an order for relief was duly entered.

### BACKGROUND

On or about March 14, 2003, the Debtor acquired real property consisting of a residence at 7615 Locust Lane, Fort Washington, Maryland. A portion of the purchase price having been obtained from First National Bank of Arizona, the Debtor executed a promissory note and deed of trust as security for the loan. The promissory note and deed of trust were subsequently

---

[1] Title 11, United States Code. References herein to sections of the Bankruptcy Code are shown as "section ___."

assigned to Mortgage Electronic Registration Systems, Inc. ("MERS").

The Debtor did not pay the promissory note in accordance with its terms and MERS instituted foreclosure proceedings.  Prior to the foreclosure sale, however, the Debtor executed a Quit Claim Deed to RCB Group, LLC ("RCB").  RCB took the necessary steps to bring the account with MERS current, some $12,000, thus avoiding the foreclosure sale.

A dispute then arose between the Debtor and RCB regarding the nature of the transaction.  This dispute resulted in RCB obtaining a state court order[2] granting it possession of the Locust Lane property.  The Debtor's chapter 13 case was filed, however, prior to the Debtor being removed from the premises.

The Debtor filed the instant complaint seeking, in effect, to undo the transfer represented by the Quit Claim Deed.  The complaint initially sought relief pursuant to three separate counts: Count I - Declaratory Relief Pursuant to Md. Code Ann., Courts & Judicial Proceedings, § 3-403, Count II - Avoidance of Preferential Transfer, and Count III - Fraudulent Conveyance.  Count II, however, was withdrawn by oral motion on the morning of the trial.

Trial of the matter was held on March 30, 2005.  On March 28, 2005, however, RCB filed a Motion in Limine ("Motion"), raising the issue of a Chapter 13 Debtor's standing to assert claims under sections 547 and 548.  While the Motion was argued prior to the commencement of the trial, the court reserved ruling thereon until after all evidence was adduced.  Following trial, the court allowed counsel twenty days within which to submit supplemental briefs with respect to the Motion; each party submitted post-hearing briefs.

---

[2]ORDER GRANTING JUDGMENT FOR POSSESSION TO PLAINTIFF, entered June 17, 2004, in The District Court of Maryland for Prince George's County.

**COUNT I**

The Debtor seeks a declaratory judgment that her transaction with RCB should be recognized as a security transaction rather than a sale. The Debtor contends that the court may reach such a holding based upon the transaction being unconscionable, as well as upon the following Maryland statute:

> (a) Every deed which by any other writing appears to have been intended only as security for payment of an indebtedness or performance of an obligation, though expressed as an absolute grant is considered a mortgage. The person for whose benefit the deed is made may not have any benefit or advantage from the recording of the deed, unless every other writing operating as a defeasance of it, or explanatory of its being intended to have the effect only of a mortgage, also is recorded in the same records at the same time.

Md. Code Ann., Real Property, Section 7-101(a).

In support of her position, the Debtor relies upon the following allegations of fact:

● The Debtor purchased the home in April 2003 for $175,000, executing a promissory note and deed of trust for $166,250.

● The value of the property in April 2004 was in excess of $225,000. As the debt to MERS at the time of the chapter 13 filing was approximately $177,500, there existed some $47,500 equity in the property.

● RCB acquired the property subject to the existing mortgage upon payment of only $13,000.

● RCB listed the property for sale at a price of $239,000.

A. Section 7-101(a).

Initially, the court observes that section 7-101(a), by its very terms, does not apply to the facts of this case. The first sentence of the statute — "Every deed which by <u>any other writing</u>

3

appears to have been <u>intended</u> only as <u>security</u> for payment of an indebtedness or performance of an obligation, though expressed as an absolute grant is considered a mortgage" — seems to indicate that other writings must be in existence for the court to conclude that a loan was intended rather than a sale. In the instant case, not one of the documents related to the transaction suggest that a loan was intended.

Even if the court were to go beyond the explicit requirement of the statute, the evidence does not suggest an intent to make a loan. Although the Debtor initially testified that she thought she was obtaining a loan and not selling her property, she later testified that Robert C. Brown, the owner of RCB, advised her prior to signing the papers that an "investor sale" was the only viable alternative. Mr. Brown also testified that he is not in the business of making loans and that he never suggested to the Debtor that he would make her a loan.

Mark Overman was the investor who provided the funds necessary to bring the MERS account current in order to postpone the foreclosure sale. He testified that he is the owner of Dominion Financial and that his business is primarily one where he "flips properties." This involves buying properties below fair market value ("FMV"), providing necessary repairs, and selling the property at FMV. He usually looks for deals where the acquisition price is 30% below FMV. In this case, he felt the deal was a little "thin," but decided to go ahead anyway. Mr. Overman was emphatic in declaring that he was not in the lending business and never intended on the transaction being considered a loan.

B.  <u>Unconscionable transaction</u>.

Notwithstanding section 7-101, the Debtor also contends that the transaction itself, even if considered a sale, was unconscionable under the circumstances. In particular, the Debtor

4

alleges that RCB acquired equity in excess of $40,000 upon payment of only $13,000. While this latter fact, if taken alone, might support this position, the full picture requires a different conclusion.

RCB is in the business of providing assistance to homeowners behind in their mortgage payments and facing foreclosure. They review public sources and send letters to homeowners facing foreclosure, such as the Debtor. Having received such a letter from RCB, the Debtor contacted Mr. Brown by telephone on February 11, 2004. After a short discussion, they agreed to meet the next day at the Debtor's home. According to Mr. Brown they met for 1 to 1½ hours, during which time they discussed her situation in detail as well as possible solutions to her problem. Time was the biggest factor, however, as the foreclosure sale was scheduled for March 3, 2004. The Debtor made no decision at that time, indicating she would get back in touch with Mr. Brown after she had an opportunity to think over the matters they had discussed.

They next met on or about February 18. At that time, the Debtor executed a consent form authorizing RCB to obtain information from MERS.

The Debtor and Mr. Brown next conferred by telephone on February 27, just a couple of days prior to the scheduled foreclosure sale. It appears that she advised him of her willingness to sell the property during this conversation, as Mr. Brown set about preparing the necessary documents. A major factor in her decision to sell appears to be the commitment by RCB to pay her a relocation allowance of up to $6,000 ($1,000/month rent for 6 months). They agreed to meet the next day, a Saturday, to execute the documents. Mr. Brown picked up the Debtor at her residence and drove to a notary public's office. They reviewed the documents in the parking lot before going inside. While their testimony conflicts as to their discussion, the court concludes

that the totality of the evidence does not support the Debtor's claim that she was taken advantage of by Mr. Brown. The court finds that the documents were not executed in blank as she contends, as the notary public before whom they were executed testified otherwise. And the Debtor's own admission that Mr. Brown told her "an investor sale" was the only viable alternative belies her claim that she thought this was a loan. Further, the fact that several days after the transaction was closed she went apartment hunting with Mr. Brown compels the conclusion that the Debtor, a college graduate, knew exactly what she was doing when she signed the Quit Claim Deed.

## COUNT III

Having reviewed the appropriate sections of the Bankruptcy Code, particularly section 522(h), and relevant jurisprudence, including Matter of Hamilton, 125 F.3d. 292, 296 (5th Cir. 1997), In re Smoot, 237 B.R. 875, 880 (Bankr. D. Md. 1999), and In re Bruce, 96 B.R. 717, 720-21 (Bankr. W.D. Tex. 1989), the court concludes that the Debtor does not have standing to assert section 548 under the facts of the case.

Judge Mannes, in Smoot, opined that—

> In order to have standing to avoid a transfer, the debtor must establish the following five elements under § 522(h): (1) the debtor could have exempted the property that is the subject of the alleged preference; (2) the transfer would have been avoidable by the trustee; (3) the trustee has not attempted to avoid the transfer; (4) the transfer was not a voluntary transfer of property by the debtor; and (5) and the property was not concealed by the debtor. *See In re DeMarah,* 62 F.3d 1248, 1250 (C.A.9 1995); 11 U.S.C. §§ 522(g), (h).

237 B.R. at 880. The Debtor has clearly failed to satisfy either element (1) or (4).

First, as Maryland has opted out of the exemption scheme set forth in section 522(d), the Debtor is limited to exemptions allowed by Maryland law and other non-bankruptcy Federal

laws. The Debtor, in her schedules filed in the case, claimed a $2,500 exemption in the residence. As there was no timely objection filed, the claimed exemption is allowed. <u>Taylor v. Freeland & Kronz</u>, 112 S.Ct. 1644 (1992). The same schedules, however, claim the value of the residence was $250,000 and that the balance due the secured creditor was only $180,000. Accepting the Debtor's figures as correct, there is equity over and above the claimed exemption in the amount of $67,500. The court concludes, however, that a reasonable interpretation of section 522(d) requires a rejection of the Debtor's standing where only a minor fraction of the property can be claimed as exempt.

The Debtor also has failed in her proof that the transfer to RCB was not voluntary. While the Debtor testified that she did not understand what she was doing and that she signed all of the papers in blank, the preponderance of the evidence suggests otherwise. Her testimony is contradicted not only by Mr. Brown and Abe Jabidian, the notary public before whom the Quit Claim Deed was signed, but also by certain events which occurred after the transaction closed.

First, Mr. Brown testified that he thoroughly explained various pre-foreclosure options to the Debtor, but that due to the impending foreclosure sale, a sale to an investor was the only viable solution. Although Mr. Jabidian did not have specific recollection of this transaction, he testified that he does not and would not notarize an incomplete document, as the Debtor suggested.

Most importantly, however, are the following facts which suggest that the Debtor knew exactly what she was signing and what those documents meant. RCB, through Mr. Brown, agreed to pay the Debtor up to $6,000 ($1,000 per month for 6 months) as a relocation allowance. In furtherance of this agreement, after the sale closed, Mr. Brown drove the Debtor

7

to inspect two separate rental properties. She chose, however, neither. At or about this time, according to Mr. Brown, the Debtor decided that she would not vacate the premises.

The Debtor also testified that prior to executing the Quit Claim Deed, Mr. Brown told her that the "only solution" he could offer at this late date was a sale to an investor. With this information, the Debtor, a college graduate, executed the various documents necessary to close the transaction.

These facts clearly belie any suggestion that the Debtor's transfer pursuant to the Quit Claim Deed was not voluntary.

### III.  CONCLUSION

For the foregoing reasons, the court concludes that the Debtor was without standing to seek avoidance pursuant to section 548, and the Motion is sustained**.**  Accordingly, Count III of the Complaint must be dismissed. Further, the Debtor has failed to satisfy her burden of proof with respect to Count I, the court concluding that (a) Md. Code Ann., Real Property, section 7-101(a) does not apply, and (b) the transaction between the Debtor and RCB will not be reformed as a security device as the transaction was not unconscionable. Accordingly, Count I of the Complaint must be dismissed**.**

Separate orders in conformity with the foregoing reasons will be entered.

**End of Memorandum Decision**

cc:    Marguerite Patricia Thomas
       7615 Locust Lane
       Fort Washington, MD 20744

Scott C. Borison
5500 Buckeystown Pike
Frederick, MD 21703

Christopher Hamlin
6411 Ivy Lane
Suite 200
Greenbelt, MD 20770